**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

|  |  |  |
|---|---|---|
| | **x** | |
| | **:** | Case No. 1:26-cv-01637 |
| C.A., on behalf of himself and all others similarly situated, | **:** | |
| | **:** | |
| | **:** | |
| *Plaintiff*, | **:** | CLASS ACTION COMPLAINT |
| | **:** | |
| v. | **:** | DEMAND FOR JURY TRIAL |
| | **:** | |
| ORACLE CORPORATION, | **:** | |
| | **:** | |
| *Defendant*. | **:** | |
| | **:** | |
| | **x** | |

## CLASS ACTION COMPLAINT

Plaintiff C.A. ("Plaintiff"), on behalf of himself and all others similarly situated, brings this Class Action Complaint against Defendant ORACLE CORPORATION ("Oracle" or the "Defendant"),  for violations of state and common laws set forth herein in connection with Defendant's failures to allow for the unlawful breach of personally identifiable and sensitive information during the applicable statutory period and continuing through the present day ("Class Period").

Plaintiff makes the following allegations based upon personal knowledge as to himself, media reporting, dark web postings from the perpetrators, alerts from various data security infrastructures, as well as upon information and the belief and investigation of his counsel as follows:

## SUMMARY OF THE CASE

1. Plaintiff C.A. brings this class action lawsuit against Defendant Oracle Corporation for its collective failure to properly secure and safeguard personally identifiable information ("PII") within their "PeopleSoft" education software product, including but not limited to: Plaintiff's and Class members' student records (name, addresses, phone numbers, email addresses, dates of birth), financial aid records, immigration and visa records, health records, administrative data, academic records, ethnicities and citizenship statuses, disabilities, passport and government ID numbers, and internet protocol and usernames to access university systems (the "Data Breach").

2. PeopleSoft, which was a standalone product eventually purchased by

1

Oracle, is the most popular software in the United States for higher education, including for the management of core operations, payroll, financial aid, human resources, health data maintenance and other purposes. To date, there are confirmed at least 100 clients of PeopleSoft whose information was accessed in the Data Breach, representing as much as 68% of those being educational institutions in the United States and United Kingdom. Plaintiff attended a university which heavily relies on PeopleSoft for its infrastructure, including for each of the purposes as listed above. The Data Breach areappears to have impacted millions of students at schools across the country.

3. On June 10, 2026, the notorious cybercriminal organization called ShinyHunters announced their infiltration into PeopleSoft – stating, we have *"billing and payment records, credit card and payment details, student finance data, and campus portal exports […] including payer contact information, transaction amounts, IP addresses, full names, home addresses, postcodes, email addresses, phone numbers, dates of birth, and other internal campus data."* On the following day, ShinyHunters issued a "final warning" stating, *"due to the significant influx of activity going on, we are kindly advising everyone who is being contacted by us to start responding or the inevitable will happen after the deadline. We are not bluffing. Thank you. Make the right decision, don't be the next headline."*

4. According to Mandiant, a global digital security firm, ShinyHunters had access and had been exploiting a vulnerability in PeopleSoft's software for at least two weeks beginning on May 27, 2026. Mandiant stated, *"[w]hile several*

2

*organizations successfully blocked the activity or remediated the vulnerability, others experienced compromise, resulting in stolen data being published on ShinyHunters [data leak site].*" Thus, the Data Breach resulted in PII being exposed on the dark web.

5. To date, Oracle has not informed the victims of the Data Breach – neither have the universities and colleges across the United States which were victim to it. As of the date of this filing, over 1,000 higher education institutions use PeopleSoft's 'Campus Solutions' platform – and the only information that students, who are the ultimate victims of this Data Breach, have is that at least 100 of those higher education institutions' data was compromised as a result of the Data breach. To compound matters, Oracle allowed ShinyHunters to penetrate Campus Solutions for over two weeks without being detected – this is a profound cybersecurity failure that could have been either avoided or mitigated had Oracle been monitoring its systems for signs of unauthorized access and/or the transfer of large volumes of data to third party networks.

6. As a software provider for over 1,000 higher education institutions in the United States, Oracle owed Plaintiff and Class members a duty to take all reasonable and necessary measures to keep their PII collected safe and secure from unauthorized access. Oracle's PeopleSoft subsidiary's entire business revolved and continues to revolve around data collection, use, and maintenance – and thus, Oracle solicited, collected, used, retained, and derived benefits from the PII, yet breached its duty to by failing to implement and maintain the necessary safeguards to eliminate

3

intrusions by the most well-known cybercriminal gang in history.

7.      Plaintiff brings this Action on behalf of all persons whose PII was compromised as a result of Oracle's failure to: (i) protect the PII of Plaintiff and Class members; (ii) warn Plaintiff and Class members of Defendant's inadequate information security practices – as well as the customers who contracted to use PeopleSoft (*e.g.* the colleges and universities); (iii) effectively secure the hardware containing the protected PII using reasonable and adequate safeguards free of vulnerabilities; and (iv) provide timely notice to the many victims of the Data Breach.

8.      As such, Plaintiff brings this Action on behalf of himself and all others similarly situated for negligence, negligence *per se*, and unjust enrichment seeking actual and punitive damages, as well as attorneys' fees, costs, and expenses, along with appropriate injunctive and declaratory relief.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d).  The amount of controversy exceeds the sum of $5,000,000 exclusive of interests and costs, there are more than 100 putative Class members, and minimal diversity exists because one or more putative Class members are citizens of a different state than a Defendant – including Plaintiff C.A. who is a New York resident whereas Defendant Oracle is domiciled in Texas.  On an annual basis, over a thousand universities and colleges with millions of students providing data through their universities and colleges to PeopleSoft's Campus Solutions.

10. This Court has personal jurisdiction over Oracle because Oracle maintains its principal place of business in Austin, Texas – and PeopleSoft, which was previous a California-based corporation, operates as now as an Oracle product. Furthermore, Oracle intentionally availed itself of this jurisdiction by marketing, employing individuals, and providing services in Texas and Oracle maintains significant activities through its PeopleSoft platform at numerous schools located in Texas which were also impacted by the Data Breach.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant Oracle operates in this District and a substantial part of the events, acts and omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

### PLAINTIFF

### *Plaintiff C.A.*

12. Plaintiff C.A. is, and at all times mentioned herein, was an individual citizen of the state of New York.

13. Plaintiff's PII was collected by Campus Solutions while as a student at a school which used and continues to use PeopleSoft – including Campus Solutions. Plaintiff understands that his PII was compromised in the Data Breach, and has spent considerable time trying to ascertain whether and how to protect his PII, dealing with the repercussions of the Data Breach (including a slew of phishing text and email messages), and monitoring his credit reporting bureaus.

### DEFENDANT

5

### *Defendant Oracle Corporation*

14.    Defendant Oracle Corporation is a technology firm with its headquarters located in Austin, Texas at 2300 Oracle Way, Austin, Texas 78741. Oracle acquired PeopleSoft, which now is entirely managed, marketed, and sold as an Oracle product.

## FACTUAL ALLEGATIONS

### *Defendant's Businesses and Collection of Private Information*

15.    In the course of doing business, Oracles's PeopleSoft Campus Solutions software acquires a significant amount of highly valuable private information from its students, alumni, and staff, including the acquisition of the PII of Plaintiff and the Class members.

16.    As a condition of providing their PII, Plaintiff and Class members understood that Oracle would only use their data for business purposes in a way that was safe and secure and would preserve the confidentiality of their data. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class members' PII, Oracle assumed legal and equitable duties and knew that it was responsible for ensuring the security and safety of Plaintiff's and Class members' PII to protect it from unauthorized disclosure and exfiltration.

17.    Plaintiff and the Class members relied on Defendant to keep their PII confidential and securely maintained, and only to make *authorized* disclosures of this information, which Defendant failed to do.

### *The Data Breach*

6

18.     On June 11, 2026, Google Threat Intelligence Group ("GTIG") and Mandiant reported that they had collectively identified and detected an active compromise and extortion campaign attributed to ShinyHunters – a notorious cybercriminal organization also known as UNC6240 – which targeted and exploited Oracle's PeopleSoft Campus Solutions application infrastructure.  Between as late as May 27, 2026 through June 9, 2026, the activity observed by GTIG and Mandiant observed a zero-day exploitation of CVE-2026-35273, a critical remote code execution vulnerability in the environment management component of Campus Solutions.

19.     On June 10, 2026, Oracle released an advisory which, unfortunately, came much too late for the end users of Campus Solutions to protect themselves.

20.     GTIG and Mandiant initiated notifications to at least 100 global organizations (most of which were in the United States and over 68% of which were in. higher education) whose IP addresses correlated with potentially vulnerable endpoints.  To penetrate the end user, ShinyHunters impersonated legitimate cloud endpoints which were used to run administrative commands and deploy malicious code which appeared as "[victim_abbreviation]_fanout.sh."   This campaign as described above is consistent with the data leaks of stolen organization published on ShinyHunters' Data Leak Site ("DLS") first appearing on June 9, 2026.

21.     The download of a sample of the information hosted from a ShinyHunters' IP address, 176.120.22.24, appeared on the DLS as follows:

7



22.    In GTIG and Mandiant's report, the cybersecurity firms recommended remediation and hardening (network isolation, endpoint access restrictions, and breaking/restricting endpoints), log & endpoint monitoring, network telemetry (monitoring firewall logs and flow of data), as well as host-level auditing and filesystem checks (including unexpected accessors of data).    Each of these recommendations are standard protocols which, under ordinary circumstances, could have either prevented or mitigated the Data Breach.

23.    Defendant was not adequately monitoring its systems for breaches and instead became aware of the Data Breach only after GTIG and Mandian made them aware of the Data Breach – which is unacceptable for any sophisticated organization, let alone a cloud software behemoth like Oracle.

24.    Defendant could have prevented or mitigated the consequences of the Data Breach by limiting access to sensitive information to only necessary employees, requiring multi-factor authentication to verify access credentials, encrypting data at rest and in transit, monitoring its systems for signs of unusual activity or the transfer

of large volumes of data, and regularly rotating passwords.

25.    Defendant's response to the Data Breach has been woefully insufficient.

26.    *First*, Defendants have yet to disseminate notification letters to victims so that those unaware of the Data Breach can take action to protect themselves (i.e. freezing credit reports, etc.).  This will hamstrung millions of people who entrusted Oracle with their PII only to have it compromised – thus, there are an untold number of victims who have any idea that they are in fact victims of the Data Breach.  This is compounded by the fact that Defendant has been unclear about or unaware of the Data Breach.  *Next*, Defendants have offered zero remediation for the Data Breach whatsoever – so all of the costs of taking preventative action, such as paying for credit monitoring, are costs that are borne by the victims as opposed to the billion-dollar corporate Defendant.  *Finally*, Defendant has yet to disclose the full nature of the breach and whether the information that Oracle still has in its control is now in fact secure.  This leaves victims with zero reassurance that Defendant has taken steps to protect their PII from being exposed yet again due to Defendant insufficient cybersecurity apparatus.

27.    The Identity Theft Research Center's 2024 Annual Data Breach Report notes that, "approximately 70 percent of cyberattack-related breach notices did not include attack information, compared to 58 percent in 2023. In 2019 and previous years, ~100 percent of breach notices included attack vector information." Eva Velasquez, CEO of the Identity Theft Resource Center, remarked that "[w]ith a near-record number of compromises and over 1.3 billion victim notices, often tied to

9

inadequate cyber practices, we are also seeing an increase in notices that provide limited actionable information for victims."[1]

28.     The PII compromised in the files accessed by hackers was not encrypted. This can also be inferred given that the hacker was able to access the data that was listed as compromised in the reporting on the Data Breach.

29.     Moreover, the exfiltration of PII from Defendant's systems demonstrates that this cyberattack was targeted by the hacker due to Defendant's status as a large software provider for educational institutions and their employers which house sensitive PII.  Armed with this PII, data thieves, like the hacker in this Action (as well as downstream purchasers of the stolen PII), can commit a variety of crimes, including: abusing Student ID numbers to impersonate students on university campuses (especially since they have those students' names and school email addresses), names of children and associated information which should never be released to the public, and private messages to teaching and educational professionals which could be highly sensitive and personal.

30.     To date, victims cannot even trust that the PII compromised in the Data Breach is sufficiently disclosed; this means that other financial aid and other application data as explained above, could contain information like government ID's (*e.g.* Social Security numbers or Tax IDs) and could very well lead to the opening new

---

[1] **Identity Theft Resource Center,** *2024 Annual Data Breach Report Reveals Near-Record Number of Compromises and Victim Notices***, ITRC (Jan. 28, 2025), available at https://www.idtheftcenter.org/post/2024-annual-data-breach-report-near-record-compromises/**

financial accounts in Class members' names, taking out loans in Class members' names, using Class members' information to obtain government benefits, filing fraudulent tax returns using Class members' tax identification information, obtaining driver's licenses in Class members' names but with a different photograph, and giving false information to police during an arrest.

31.    Due to Defendant's flawed security measures and incompetent response to the Data Breach, Plaintiff and the Class members now face a present, substantial, and imminent risk of fraud and identity theft and must deal with that threat forever.

32.    Despite widespread knowledge of the dangers of identity theft and fraud associated with cyberattacks and unauthorized disclosure of PII, and despite Defendant's generous operating budget, Defendant provided unreasonably deficient protections prior to the Data Breach, including but not limited to a lack of security measures for storing and handling PII, as well as inadequate employee training regarding how to access, oversee the protection, handle and safeguard for this sensitive set of information.

33.    Defendant failed to adequately adopt and train its employees and third-parties on even the most basic of information security protocols, including storing, locking, encrypting and limiting access to current and former consumers and employees' highly sensitive PII; implementing guidelines for accessing, maintaining, and communicating sensitive PII; and protecting sensitive PII by implementing protocols on how to utilize such information.

34.    Defendant's failures caused the unpermitted disclosure of Plaintiff's and

11

Class members' PII to an unauthorized third-party cybercriminal and put Plaintiff and Class members at serious, immediate, and continuous risk of identity theft and fraud.

35.    The Data Breach that exposed Plaintiff's and Class members' PII was caused by Defendant's violation of its obligations to abide by best practices and industry standards concerning its information security practices and processes.

36.    Defendant, despite being a technologically advanced organization, failed to comply with basic security standards or to implement security measures that could have prevented or mitigated the Data Breach.

37.    Defendant failed to ensure that all personnel with access to its current/former consumers' PII were properly trained in retrieving, handling, using and distributing sensitive information.  Further, there have been no assurances offered by Defendant that all personal data or copies of the PII at issue were either recovered, destroyed, or otherwise protected by an enhanced data security protection apparatus.

### *The Breach Was Foreseeable*

38.    Defendant has significant obligations created by industry standards, common law, and its own promises and representations to keep PII confidential and to protect it from unauthorized access and disclosure.

39.    Plaintiff and Class members provided their PII to Defendant with the reasonable expectation and mutual understanding that a sophisticated corporation like Defendants would comply with its obligations to keep such information

12

confidential and secure from unauthorized access.

40.    Defendant's data security obligations were particularly acute given the substantial increase in ransomware attacks and/or data breaches in various industries (especially including the education services industry) preceding the date of the Data Breach – including Canvas, PowerSchool, Illuminate, and others.

41.    Defendant was aware of the risk of data breaches because such breaches have dominated the headlines in recent years.

42.    Cyberattacks have become so notorious that the Federal Bureau of Investigation and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack.

43.    PII is of great value to hackers and cybercriminals, and the data compromised in the Data Breach can be used in a variety of unlawful manners.  PII can be used to distinguish, identify or trace an individual's identity.  This can be accomplished alone or in combination with other personal or identifying information that is connected or linked to an individual, such as the information compromised in the Data Breach.

44.    Given the nature of the Data Breach, it is foreseeable that the compromised PII can (and likely will) be used by hackers and cybercriminals in a variety of different ways.

45.    Cybercriminals who possess the Class members' PII can readily obtain Class members' tax returns or open fraudulent credit card or other types of accounts in the Class members' names.

13

46.    The increase in such attacks, and attendant risk of future attacks, was widely known.

47.    As such, this specific Data Breach was foreseeable.  Defendant was cognizant of data breaches because of how common and high-profile data breaches have become with respect to consumer-facing businesses such as Defendant.

### *Defendant Failed to Follow FTC Guidelines,*

### *COPPA and Industry Standards*

48.    Experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the data which they collect and maintain.  The reason this data is so valuable is because it contains PII, which can be sold and weaponized for purposes of committing various identity theft-related crimes.  It is well-known that, because of the value of this data and PII, businesses that collect, store, maintain, and otherwise utilize or profit from PII must take necessary cybersecurity safeguards to ensure that the data they possess is adequately protected.

49.    Government agencies also highlight the importance of cybersecurity practices.  For example, the Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices.

50.    According to the FTC, the need for data security should be factored into all business decision-making.

51.    In 2016, the FTC updated its publication, Protecting Personal

14

Information: A Guide for Business, which established cyber-security guidelines for businesses.

52.     The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

53.     The guidelines also recommend that businesses use an intrusion detection system to detect and expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

54.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

55.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, in some cases treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.  Orders resulting from these actions further explicate and clarify the measures businesses

15

must take to meet their data security obligations.

56.     Defendant failed to properly implement some or all of these (and other) basic data security practices.

57.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

58.     Defendant was at all times fully aware of its obligation to protect PII. Defendant was also aware of the significant repercussions that would result from its failure to do so.

59.     Experts studying cyber security routinely identify consumer-facing businesses as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

60.     Several best practices have been identified that, at a minimum, should be implemented by major school and other university systems such as Canvas (and its third party vendors), including but not limited to: educating all employees about cyber security; requiring strong passwords; maintaining multi-layer security, including firewalls, anti-virus, and anti-malware software; utilizing encryption; making data unreadable without a key; implementing multi-factor authentication; backing up data; and limiting which particular employees can access sensitive data.

61.     Other best cybersecurity practices that are standard in the industry include installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up

network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; and training staff regarding critical points.

62.    These foregoing frameworks are existing and applicable industry standards.   Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

### *Defendant's Breaches of Its Obligations*

63.    Defendant breached its obligations to Plaintiff and Class members and was otherwise negligent and/or reckless because it failed to properly maintain, oversee and safeguard relevant computer systems, network and data.   In addition to its obligations under federal and state law, Defendant owed a duty to Plaintiff and the Class members to exercise reasonable care when obtaining, retaining, securing, safeguarding, deleting, and protecting the PII it collected from being compromised, lost, stolen, accessed or misused by unauthorized persons.   Defendant owed a duty to Plaintiff and Class members to provide reasonable security, including complying with industry standards and requirements, training for its staff and ensuring that their collective computer systems, networks, and protocols adequately protected the PII of Plaintiff and the Class members.

64.    Defendant wrongful conduct includes, but is not limited to, the following acts and/or omissions:

   a.   Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

   b.   Failing to adequately protect current or former consumers' PII;

17

c. Failing to properly monitor third-party data security systems for existing intrusions, brute-force attempts and clearing of event logs;

d. Failing to ensure that all third-parties apply all available and necessary security updates;

e. Failing to ensure that all third-parties install the latest software patches, update its firewalls, check user account privileges, or ensure proper security practices;

f. Failing to ensure that all third-parties practice the principle of least-privilege and maintain credential hygiene; and failing to avoid the use of domain-wide, admin-level service accounts;

g. Failing to adequately oversee third-party vendors;

h. Failing to ensure that all third-parties employ or enforce the use of strong randomized, just-in-time local administrator passwords; and

i. Failing to properly train and supervise third-parties in the proper handling of inbound emails.

65. As the result of allowing its computer systems to fall into dire need of security upgrading and its inadequate procedures for handling cybersecurity threats, Defendant negligently and wrongfully failed to safeguard Plaintiff's and Class members' PII.

66. Accordingly, as further detailed herein, Plaintiff and Class members now face a substantial, increased, and immediate risk of fraud, identity theft, and the disclosure of their most sensitive personal information.

18

### *Data Breaches are Disruptive and Harm Victims*

67.     The United States Government Accountability Office ("GAO") released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

68.     That is because all victims of a data breach may be exposed to serious ramifications regardless of the nature of the data.  Indeed, the reason criminals steal PII is to monetize it because there is (unfortunately) a market for personally identifiable information, like the PII compromised by the Data Breach.

69.     Cybercriminals do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, and to take over victims' identities in order to engage in illegal financial transactions under the victims' names.  Because a person's identity is akin to a puzzle, the more accurate individual pieces of data an identity thief obtains regarding a person, the easier it is for that thief to take on the victim's identity, or otherwise harass or track the victim.

70.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information regarding a victim's identity, such as a person's login credentials or Social Security number.  Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

19

71.    A stolen Social Security number is a skeleton key to the victim's identity – and, therefore, the type of data that cyberthieves seek.  Identity thieves can use a Social Security number for a variety of crimes, including credit card fraud, phone or utilities fraud, bank fraud, fraudulently obtaining a job, fraudulently renting a house, or filing a false police report.

72.    Because of the threat of these harms, the FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and potentially obtaining an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.

73.    Theft of PII is gravely serious.

74.    PII is an extremely valuable property right.

75.    Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences.  Even this obvious risk to reward analysis illustrates that PII has considerable market value.

76.    According to the GAO:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft.  Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* GAO Report, at p. 29.

77.     Private information, such as the PII compromised herein, is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.  The private information of consumers remains of high value to criminals, as evidenced by the prices paid through the dark web.  Numerous sources cite dark web pricing for stolen identity credentials.  For example, private information (inclusive of a Social Security number) can be sold at a price from $40 to $200, and bank details have a price range of $50 to $200.  Experian reports that a stolen credit card or debit card number can sell between $5 to $110 on the dark web.  Clearly, all this data has real value – which is why it was targeted and stolen in the first place.

78.     Because of the value of the PII compromised in the Data Breach, there is a strong probability that entire batches of information stolen in the Data Breach have been dumped on the black market, as that is the *modus operandi* of cybercriminals who perpetrate data breaches, while other batches have yet to be dumped on the black market, meaning Plaintiff and Class members are at a substantial imminent risk of injury including an increased risk of fraud and identity theft for many years into the future.

79.     Thus, Plaintiff and Class members must vigilantly monitor their financial, medical, and other accounts and other indices of identity theft (*i.e.*, the mail, email, etc.) for many years to come.

### Harm to Plaintiff and the Class

21

80. Plaintiff was a student at one more schools which used Campus Solutions in order to maintain oversight over his educational experience.

81. As a result of being informed about the Data Breach, Plaintiff has commenced making reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, and reviewing reports and his financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff has already spent time dealing with the Data Breach, valuable time Plaintiff otherwise would have spent on other activities.

82. Plaintiff suffered actual injury from having his PII compromised as a result of the Data Breach including, but not limited to (a) actual misuse of his compromised PII; (b) damage to and diminution in the value of his PII, a form of property that Defendant obtained from Plaintiff; (c) violation of his privacy, including the compromise of highly sensitive PII such as, for example, his Social Security number and PHI in combination with name and other private information; (d) present, imminent and impending injury arising from the increased risk of identity theft and fraud; and (e) actual and potential out-of-pocket losses including the loss of time, as Plaintiff has spent multiple hours dealing with the repercussions of the Data Breach, due to time spent mitigating the actual and potential harms caused by the Data Breach.

## CLASS ALLEGATIONS

83. Plaintiff C.A. brings this nationwide class on behalf of himself and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4)

of the Federal Rules of Civil Procedure. The "Class" that the Plaintiff seeks to represent is defined as follows:

> **Class Definition.** All persons in the United States whose PII was maintained by Oracle's PeopleSoft Campus Solutions (and other affiliated) software and was compromised in the Data Breach.

84. Excluded from the Class are Defendant and Defendant's subsidiaries, affiliates, officers and directors, and any entity in which the Defendant has a controlling interest; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

85. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

86. **Numerosity**. Upon information and belief, there are at least millions of additional victims of this Data Breach spread out throughout the United States. Therefore, the members of the Class are so numerous that joinder of all members is impractical.

87. **Commonality**. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

> a. Whether Defendant unlawfully used, maintained, lost or disclosed Plaintiff's and Class members' PII;
>
> b. Whether Defendant (and/or its third-party vendors) failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;
>
> c. Whether Defendant's (and its third-party vendors') data

23

security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. Whether Defendant's (and its third-party vendors') data security systems prior to and during the Data Breach were consistent with industry standards;

e. Whether Defendant owed a duty to Plaintiff and Class members to safeguard their PII;

f. Whether Defendant breached its duty to Plaintiff and Class members to safeguard their PII;

g. Whether computer hackers obtained Plaintiff's and Class members' PII in the Data Breach;

h. Whether Defendant knew or should have known that its (and its third-party vendors') data security systems and monitoring processes were deficient;

i. Whether Plaintiff and Class members suffered legally cognizable damages as a result of Defendant's misconduct;

j. Whether Defendant's acts, inactions, and practices complained of herein amount to common law negligence;

k. Whether Defendant failed to provide notice of the Data Breach in a timely and proper manner; and

l. Whether Plaintiff and Class members are entitled to damages, civil penalties, punitive damages, equitable relief and/or injunctive relief.

88. **Typicality**. Plaintiff's claims are typical of those of other Class members because Plaintiff's PII, like that of every other Class member, was compromised by the Data Breach. Further, Plaintiff, like all Class members, was injured by Defendant's uniform conduct. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of other Class

members arise from the same operative facts and are based on the same legal theories.

89. **Adequacy of Representation**.  Plaintiff will fairly and adequately represent and protect the interests of the Class in that they have no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Class.  The damages and infringement of rights Plaintiff suffered are typical of the other Class members, and Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class.  Plaintiff has retained counsel experienced in complex class action litigation, including, but not limited to, data privacy class action litigation, and Plaintiff intends to prosecute this action vigorously.

90. **Superiority of Class Action**.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class's common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based upon an identical set of facts.  Without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

91. The litigation of the claims brought herein is manageable.  Defendant's uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of Class members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

25

92.    Adequate notice can be given to Class members directly using information maintained in Defendant's records.

93.    **Predominance**.    The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.  Defendant has engaged in a common course of conduct toward Plaintiff and Class members.  The common issues arising from Defendant's conduct affecting Class members set out above predominate over any individualized issues. Adjudication of these issues in a single action has important and desirable advantages of judicial economy.

94.    This proposed class action does not present any unique management difficulties.

**COUNT I**
**NEGLIGENCE**

95.    Plaintiff and the Class repeat and re-allege each and every allegation as if fully set forth herein.

96.    Defendant required Plaintiff and Class Members to submit sensitive, confidential Private Information to Defendant as a condition of obtaining services with Defendant; Plaintiff and Class Members provided their PII to Defendant.

97.    Defendant had full knowledge of the sensitivity of the PII to which it was entrusted, and the types of harm that Plaintiff and Class Members could and would suffer if the PII was wrongfully disclosed to unauthorized persons.

98.    Defendant owed a duty to Plaintiff and each Class Member to exercise

26

reasonable care in holding, safeguarding, and protecting the PII it collected from them.

99.    Plaintiff and Class Members were the foreseeable victims of any inadequate data safety and security practices by Defendant.

100.    Plaintiff and the Class Members had no ability to protect their PII in Defendant's possession.

101.    By collecting, transmitting, and storing Plaintiff's and Class Members' PII Defendant owed Plaintiff and Class Members a duty of care to use reasonable means to secure and safeguard their PII, to prevent the information's unauthorized disclosure, and to safeguard it from theft or exfiltration to cybercriminals. Defendant's duty included the responsibility to implement processes by which it could detect and identify malicious activity or unauthorized access on its networks or servers.

102.    Defendant owed a duty of care to Plaintiff and the Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that controls for its networks, servers, and systems, and the personnel responsible for them, adequately protected Plaintiff's and Class Members' PII.  This duty included the responsibility to train Defendant's employees to recognize and prevent attempts to gain initial unauthorized access through common techniques like phishing.

103.    Defendant's duty to use reasonable security measures arose because of the special relationship that existed between it and its customers, which is recognized

27

by laws and regulations including but not limited to the FTC Act, as well as the common law. Defendant was able to ensure its network servers and systems were sufficiently protected against the foreseeable harm a data breach would cause Plaintiff and Class Members, yet it failed to do so.

104. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

105. Pursuant to the FTC Act, 15 U.S.C. § 45 et seq., Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

106. Defendant breached its duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices and procedures to safeguard Plaintiff's and Class Members' PII, by failing to ensure the PII in its systems was encrypted and timely deleted when no longer needed, and by failing to provide notice to Plaintiffs and Class Members of the Data Breach within a reasonable time after discovering it.

107. The injuries to Plaintiff and Class Members resulting from the Data Breach were directly and indirectly caused by Defendant's violations of the FTC Act.

108. Plaintiff and Class Members are within the class of persons the FTC Act is intended to protect.

28

109. The type of harm that resulted from the Data Breach was the type of harm the FTC Act is intended to guard against.

110. Defendant's failures to comply with the FTC Act constitutes negligence per se.

111. Defendant's duty to use reasonable care in protecting Plaintiff's and Class Members' confidential PII in its possession arose not only because of the statutes and regulations described above, but also because Defendant is bound by industry standards to reasonably protect such PII.

112. Defendant breached its duties of care, and was grossly negligent, by acts of omission or commission, including by failing to use reasonable measures or even minimally reasonable measures to protect the Plaintiff's and Class Members' PII from unauthorized disclosure in this Data Breach.

113. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' PII;

b. Maintaining and/or transmitting Plaintiff's and Class Members' PII in unencrypted and identifiable form;

c. Failing to implement data security measures, like adequate MFA for as many systems as possible, to safeguard against known techniques for initial unauthorized access to network servers and systems;

d. Failing to adequately train employees on proper cybersecurity protocols;

29

e. Failing to adequately monitor the security of its networks and systems;

f. Failure to periodically ensure its network system had plans in place to maintain reasonable data security safeguards;

g. Allowing unauthorized access to Plaintiff's and Class Members' PII; and

h. Failing to timely or adequately notify Plaintiff and Class Members about the Data Breach so they could take appropriate steps to mitigate the potential for identity theft and other damages.

114. But for Defendant's wrongful and negligent breaches of its duties owed to Plaintiff and Class Members, their PII would not have been compromised because the malicious activity would have been identified and stopped before criminal hackers had a chance to inventory Defendant's digital assets, stage them, and then exfiltrate them.

115. It was foreseeable that Defendant's failure to use reasonable measures to protect Plaintiff's and Class Members' PII would injure Plaintiff and Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in Defendant's industry.

116. It was therefore foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' PII would cause them one or more types of injuries.

117. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will suffer injuries, including but not limited to (a) invasion of privacy; (b) lost or diminished value of their PII; (c) actual identity theft, or the imminent and substantial risk of identity theft or fraud; (d) out-of-pocket and lost opportunity costs associated with attempting to mitigate the actual consequences

of the Data Breach, including but not limited to lost time; (e) loss of benefit of the bargain; (f) anxiety and emotional harm due to their PII's disclosure to cybercriminals; and (g) the continued and certainly increased risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect it.

118. Plaintiff and Class Members are entitled to damages, including compensatory, consequential, punitive, and nominal damages, in an amount to be proven at trial.

119. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) provide adequate and lifetime credit monitoring to Plaintiff and all Class Members.

**COUNT II**
**UNJUST ENRICHMENT**

120. Plaintiff repeats and re-alleges each and every allegation as if fully set forth herein.

121. Plaintiff and Class Members conferred a direct benefit on Defendant by way of providing payments for educational services which were in turn paid to Defendant by its clients.

122. Defendant required Plaintiff's and Class Members' PII to conduct its revenue-generating business, which it could not do without collecting and

31

maintaining Plaintiff and Class Members PII.

123.    Plaintiff and Class that Defendant was supposed to use part of the payments it received for reasonable data security and protection for Plaintiff's and Class Members' PII.

124.    Defendant benefitted from collecting and using Plaintiff's and Class Members' PII, using it to drive its revenue-generating operations.

125.    Defendant enriched itself by hoarding the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII. Instead of providing a reasonable level of security that would have prevented and/or detected the Data Breach, Defendant calculated to increase its own profit at the expense of Plaintiff and Class Members by utilizing cheap, ineffective security measures and diverting those funds to its own personal use. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their PII.

126.    Defendant failed to provide reasonable security, safeguards, and protections to the PII of Plaintiff and Class Members, and as a result, Defendant underpaid Plaintiff and Class Members for their labor.

127.    Under principles of equity and good conscience, Defendant should not be permitted to retain the money it unjustly received from Plaintiff and Class Members because Defendant failed to provide adequate safeguards and security measures to protect Plaintiff's and Class Members' PII, which Plaintiff and Class Members

32

provided their labor in exchange for but did not receive.

128. Defendant wrongfully accepted and retained the benefits of Plaintiff's and Class Members' labor and PII and was enriched to their detriments.

129. Defendant's enrichment at Plaintiff's and Class Members' expense is unjust.

130. As a result of Defendant's wrongful conduct and resulting unjust enrichment, Plaintiff and Class Members are entitled to restitution and disgorgement of profits, benefits, and other compensation obtained by Defendant, plus reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own behalf and on behalf of all others similarly situated, prays for relief as follows:

A. For an Order certifying this case as a class action, appointing Plaintiff as the lead plaintiff in this Action, and appointing Plaintiff's below-listed counsel as lead counsel in this Action;

B. For an award of restitution, actual damages, compensatory damages, statutory damages, nominal damages and statutory penalties, in an amount to be determined, as allowable by law;

C. For an award of equitable and injunctive relief;

D. For injunctive and other equitable relief to ensure the protection of the sensitive information of Plaintiff and the Class which remains in Defendant's possession;

33

E.      For an award of attorneys' fees and costs;

F.      For pre- and post-judgment interest on any amounts awarded; and

G.      For such other and further relief as the Court may deem just and

proper.

**JURY TRIAL DEMAND**

131.    Plaintiff hereby demands a trial by jury of all claims so triable.

**DATED:** June 17, 2026                    Respectfully submitted,

Jeff Ostrow (*pro hac vice* forthcoming)
KOPELOWITZ OSTROW P.A.
One West Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
Tel: (954) 525-4100
ostrow@kolawyers.com

John J. Nelson (pro hac vice forthcoming)
MILBERG, PLLC
280 S. Beverly Drive-Penthouse
Beverly Hills, CA 90212
Tel: (858) 209-6941
jnelson@milberg.com

*/s/W. Mark Lanier*
W. Mark Lanier
TX Bar No. 11934600
THE LANIER LAW FIRM, P.C.
10940 W. Sam Houston Pkwy N.
Suite 100
Houston, TX 77064
Tel.: 713-659-5200
mark.lanier@lanierlawfirm.com

Evan M. Janush (*pro hac vice forthcoming*)
THE LANIER LAW FIRM, P.C.
535 Madison Ave
New York, NY 10022
Tel.: 212-421-2800
evan.janush@lanierlawfirm.com

34

Blake Hunter Yagman
YAGMAN PLLC
626 RexCorp Plaza
Uniondale, New York 11556
Tel.:   (929) 709-1493
Email:  blake.yagman@yagmanpllc.com

35